UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------ X

HERBERT ALFORD,                          :
                                         :
                    Plaintiff,           :
                                         :
    -against-                            :
                                         :
UNITED STATES OF AMERICA,                :
                                         :
                    Defendant.           :

------------------------------ X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 01/23/2020

No. 17 Civ. 5217 (JFK)
**OPINION & ORDER**

APPEARANCES

FOR PLAINTIFF HERBERT ALFORD:
    Elizabeth Montesano
    SULLIVAN PAPAIN BLOCK MCGRATH & CANNAVO

FOR DEFENDANTS ERIC J. EPSTEIN, M.D. & MONTEFIORE MEDICAL CENTER:
    Milan P. Spisek
    Laura B. Jordan
    WILSON, ELSER, MOSKOWITZ, EDELMAN & DICKER LLP

FOR DEFENDANT UNITED STATES OF AMERICA:
    Kirti Vaidya Reddy
    U.S. ATTORNEY'S OFFICE FOR THE SOUTHERN DISTRICT OF NEW YORK

**JOHN F. KEENAN, United States District Judge:**

Before the Court are motions for summary judgment by Defendant United States of America ("the Government") and Defendants Eric J. Epstein, M.D. ("Dr. Epstein") and Montefiore Medical Center ("MMC") (together with Dr. Epstein, "the Epstein Defendants") in this Federal Tort Claims Act (FTCA), 28 U.S.C. §§ 1346(b), 2401(b), and 2671–80, and New York state law medical malpractice action brought by Plaintiff Herbert Alford ("Plaintiff"). Plaintiff asserts negligence claims against the

1

Government arising out of care that he received from Kai A. Pittman, M.D. ("Dr. Pittman"), a primary care physician and employee at a federally funded clinic;[1] and Dr. Epstein, an endocrinologist at MMC. Plaintiff alleges that Drs. Pittman and Epstein failed to perform necessary follow-up tests that would have uncovered Plaintiff's kidney cancer before it was allowed grow and cause substantial harm to his current and future health.

The Government argues that the testimony proffered by Plaintiff's expert witnesses is insufficient to establish the causation element of a prima facie medical malpractice claim because the testimony is impermissibly speculative, and it must be excluded under the Federal Rules of Evidence. The Epstein Defendants argue that Plaintiff has failed to establish a claim against them because neither of Plaintiff's experts substantiate the allegation that Dr. Epstein breached the applicable standard of care. Plaintiff counters that triable issues exist regarding

---

[1] By a Stipulation and Order dated December 20, 2017, (ECF No. 31), the parties agreed that (1) the MMC-owned and -operated Castle Hill Family Practice ("CHFP") was part of the Public Health Service, and (2) Dr. Pittman, who was originally named in the Complaint, (a) was an employee of MMC assigned to CHFP and (b) rendered care to Plaintiff at CHFP. Accordingly, the parties agreed that Dr. Pittman and MMC, to the extent services were provided to Plaintiff at CHFP, were a federal employee and a federal entity, respectively, for the purposes of this action. Therefore, Plaintiff's claims against Dr. Pittman, and his claims against MMC based on the services it provided at CHFP, were dismissed because the Government is the proper defendant under the Public Health Service Act, 42 U.S.C. § 233(a).

whether Dr. Pittman's actions caused a more than one-year delay in his cancer diagnosis that, left undiagnosed and untreated, exacerbated the cancer's damage to Plaintiff's kidneys, which necessitated extensive surgery and triggered Plaintiff's current, chronic renal failure.  Plaintiff did not oppose the Epstein Defendants' motion for summary judgment and consented to their dismissal from this action during oral argument on January 9, 2020.

For the reasons set forth below, the Epstein Defendants' motion for summary judgment is GRANTED; the Government's motion is DENIED.  Plaintiff's claims against the Government will proceed to a bench trial beginning on April 27, 2020.

## I. Background

### A. Factual Background

The following facts are primarily taken from the parties' statements pursuant to Local Civil Rule 56.1;[2] specifically: (1) the Government's 56.1 statement (Def. United States of America's Statement of Undisputed Material Facts Pursuant to Local Rule

---

[2] Local Civil Rule 56.1(a) requires the moving party to submit a "short and concise statement, in numbered paragraphs, of the material facts as to which the moving party contends there is no genuine issue to be tried."  The nonmoving party, in turn, must submit "a correspondingly numbered paragraph responding to each numbered paragraph in the statement of the moving party, and if necessary, additional paragraphs containing a separate, short[,] and concise statement of additional material facts as to which it is contended that there exists a genuine issue to be tried." Local Civ. R. 56.1(b).

56.1 ("USA's 56.1"), ECF No. 60); (2) the Epstein Defendants'

56.1 statement (Defs. Epstein and Montefiore Medical Center's

Statement Pursuant to Local Rule 56.1 ("Epstein Defs.' 56.1"),

ECF No. 52); (3) Plaintiff's 56.1 statement (Pl.'s Resp. and

Counterstatement in Opp'n to Def. United States of America's

Mot. for Summary Judgment ("Pl.'s 56.1"), ECF No. 66); and (4)

the admissible evidence submitted by the parties.[3]  The facts

described below are not in dispute, except to the extent

indicated, and they are recounted in the light most favorable to

Plaintiff, the non-movant.[4]

---

[3] Plaintiff did not oppose the Epstein Defendants' motion for summary judgment, and he did not file a response or counterstatement to the Epstein Defendants' 56.1 statement.  In the Second Circuit, a counseled party's failure to respond to a Rule 56.1 statement requires any facts asserted in that statement to be deemed admitted. See Local Civ. R. 56.1(c) ("Each numbered paragraph in the statement of material facts set forth in the statement required to be served by the moving party will be deemed to be admitted for purposes of the motion unless specifically controverted by a correspondingly numbered paragraph in the statement required to be served by the opposing party."); see also T.Y. v. N.Y.C. Dep't of Educ., 584 F.3d 412, 418 (2d Cir. 2009) ("A nonmoving party's failure to respond to a Rule 56.1 statement permits the court to conclude that the facts asserted in the statement are uncontested and admissible."); Union Capital LLC v. 5BARZ Int'l Inc., No. 16-cv-6203 (KBF), 2016 WL 8794475, at *1 (S.D.N.Y. Oct. 5, 2016) (same).  Accordingly, with respect to the Epstein Defendants' motion for summary judgment, the Court deems admitted all factual assertions in the Epstein Defendants' 56.1 statement.  With respect to the Government's motion for summary judgment, the Court deems admitted only those factual assertions that are not disputed by either the Government or Plaintiff, and which are directly and unambiguously supported by the clinical records the parties submitted along with their 56.1 statements.

[4] Where possible, the Court has relied on the undisputed facts in Plaintiff's 56.1 statement.  Unless otherwise noted, citations herein to one party's Rule 56.1 statement alone indicates that the cited factual assertion is not in dispute.  However, direct citations to the record also have been used where relevant facts were not included in

## 1. Plaintiff's Prior Treatment at MMC

Plaintiff was a 60-year-old male when he initiated care at MMC's Fordham Family Practice on May 21, 2010. (Epstein Defs.' 56.1 ¶ 11; USA's 56.1 ¶ 1; Ex. 12 to Pl.'s 56.1 ("MMC Chart"), ECF No. 66-15, at 68–70.) During Plaintiff's first office visit with non-party Uche Akwuba, M.D. ("Dr. Akwuba"), Plaintiff's weight was measured to be 170 lbs. (USA's 56.1 ¶ 2; MMC Chart at 69.) The date of Plaintiff's last colonoscopy was noted to be in May 2005. (Epstein Defs.' 56.1 ¶ 11; MMC Chart at 70.)

Plaintiff met with Dr. Akwuba, Dr. Epstein, and other MMC providers throughout 2010, 2011, and 2012, to undergo tests and receive treatment for a variety of health issues, including erectile dysfunction ("ED"),[5] eczema,[6] and hypertension ("HTN").[7] (Epstein Defs.' 56.1 ¶¶ 12–45; MMC Chart at 68–70 (May 21, 2010

---

any of the parties' Rule 56.1 submissions, or where the parties did not accurately characterize the record. Page number citations to a document in the record refers to the document's Bates stamp.

[5] Erectile dysfunction is a "chronic inability to achieve or maintain an erection satisfactory for sexual intercourse." Erectile dysfunction, Merriam-Webster's Online Dictionary, https://www.merriam-webster.com/dictionary/erectile%20dysfunction (last visited Jan. 10, 2020).

[6] Eczema is "an inflammatory condition of the skin characterized by redness, itching, and oozing vesicular lesions which become scaly, crusted, or hardened." Eczema, Merriam-Webster's Online Dictionary, https://www.merriam-webster.com/dictionary/eczema (last visited Jan. 10, 2020).

[7] Hypertension is "abnormally high blood pressure" and "the systemic condition accompanying high blood pressure." Hypertension, Merriam-Webster's Online Dictionary, https://www.merriam-webster.com/dictionary/hypertension (last visited Jan. 10, 2020).

office visit with Dr. Akwuba), 61–62 (June 15, 2010 office visit with Dr. Akwuba), 56–58 (Oct. 21, 2010 office visit with Dr. Akwuba), 44–45 (Nov. 12, 2010 office visit with Dr. Akwuba), 39–42 (Apr. 6, 2011 office visit with Dr. Epstein), 115–17 (Dec. 8, 2011 office visit with Dr. Epstein), 95–97 (Mar. 16, 2012 office visit with Dr. Akwuba).)  During Plaintiff's office visits with Dr. Akwuba in June 2010, October 2010, and November 2010, Plaintiff's weight was measured to be 174 lbs., 174 lbs., and 172 lbs., respectively.  (MMC Chart at 61, 56, 44.)  In 2011, Dr. Akwuba referred Plaintiff to Dr. Epstein for treatment of Plaintiff's ED and low testosterone levels.  (Epstein Defs.' 56.1 ¶ 16; MMC Chart at 74.)

On April 6, 2011, Plaintiff saw Dr. Epstein for the first time.  (Epstein Defs.' 56.1 ¶ 18; MMC Chart at 39–42.) Plaintiff's weight was measured to be 174 lbs.  (MMC Chart at 40.)  Dr. Epstein diagnosed Plaintiff with hypogonadism[8] and prescribed a variety of tests, including blood work, an MRI, and a urology evaluation.  (Epstein Defs.' 56.1 ¶ 18; MMC Chart at 39–42.)  On April 11, 2011, Dr. Epstein left a message with Plaintiff regarding the tests that he had recommended, and on April 29, 2011, Dr. Epstein left an additional message because

---

[8] "Hypogonadism occurs when the body's sex glands produce little or no hormones." Hypogonadism, MedlinePlus, https://medlineplus.gov/ency/article/001195.htm (last visited Jan. 10, 2020).

it appeared that Plaintiff had missed his MRI appointment. (Epstein Defs.' 56.1 ¶¶ 19, 21; MMC Chart at 25, 77.)

On May 20, 2011, Plaintiff underwent an MRI which revealed a small microadenoma of the left pituitary.[9] (Epstein Defs.' 56.1 ¶ 23; MMC Chart at 88–89.) On May 23, 2011, MMC sent a letter to Plaintiff stating that Plaintiff appeared to have missed his urology appointment, and on May 31, 2011, Dr. Epstein sent a letter to Plaintiff stating that he had been unable to reach Plaintiff by phone or leave a message and asking Plaintiff to call his office to discuss Plaintiff's MRI results. (Epstein Defs.' 56.1 ¶¶ 24–25; MMC Chart at 86–87.)

On June 6, 2011, Plaintiff underwent a bone density scan which yielded normal results. (Epstein Defs.' 56.1 ¶ 26; MMC Chart at 84–85.) The following day, Dr. Epstein tried to return Plaintiff's calls regarding Plaintiff's lab and MRI results, but he was unable to connect with Plaintiff. (Epstein Defs.' 56.1 ¶ 27; MMC Chart at 83.) After Dr. Epstein again tried to connect with Plaintiff over the phone on June 16, and June 20, 2011, the two finally spoke on June 22, 2011. (Epstein Defs.' 56.1 ¶¶ 28–

---

[9] Microadenoma of the left pituitary is a very small, benign tumor of the pituitary gland, which is a small organ in the brain that produces various internal secretions. See Adenoma, Merriam-Webster's Online Dictionary, https://www.merriam-webster.com/dictionary/adenoma (last visited Jan. 10, 2020); Pituitary gland, Merriam-Webster's Online Dictionary, https://www.merriam-webster.com/dictionary/pituitary%20gland (last visited Jan. 10, 2020).

29; MMC Chart at 80–82.)  Dr. Epstein explained that Plaintiff's

microadenoma would need to be checked in one year and Plaintiff

needed a 24-hour urine collection ("24 UFC").  (Epstein Defs.'

56.1 ¶ 29; MMC Chart at 80.)  Dr. Epstein also re-referred

Plaintiff to urology.  (Epstein Defs.' 56.1 ¶ 29; MMC Chart at

80.)  On July 15, 2011, Plaintiff underwent the 24 UFC and on

August 2, 2011, he was advised by letter that the results were

normal.  (Epstein Defs.' 56.1 ¶¶ 30–31; MMC Chart at 122.)

On October 7, 2011, Dr. Epstein told Plaintiff that he had

hypogonadotropic hypogonadism[10] and explained that Plaintiff

needed to see a urologist for a prostate exam prior to starting

testosterone replacement therapy.  (Epstein Defs.' 56.1 ¶ 34;

MMC Chart at 119.)  Dr. Epstein also told Plaintiff that he

needed to schedule a follow-up appointment for December 2011.

(Epstein Defs.' 56.1 ¶ 33; MMC Chart at 119–20.)

On December 8, 2011, Plaintiff saw Dr. Epstein for the

follow-up appointment.  (Epstein Defs.' 56.1 ¶ 36; MMC Chart at

115–17.)  Plaintiff's weight was measured to be 173 lbs.  (MMC

---

[10] Hypogonadotropic hypogonadism is a condition in which the male
testes produce little or no sex hormones due to a problem with the
pituitary gland or hypothalamus, which are small regions of the brain
that help regulate certain bodily functions. See Hypogonadotropic
hypogonadism, MedlinePlus,
https://medlineplus.gov/ency/article/000390.htm (last visited Jan. 10,
2020); Hypothalamus, Merriam-Webster's Online Dictionary,
https://www.merriam-webster.com/dictionary/hypothalamus (last visited
Jan. 10, 2020).

Chart at 116.)  During the exam, Dr. Epstein noted that he was not able to palpate Plaintiff's prostate, and he once again recommended that Plaintiff see a urologist.  (Epstein Defs.' 56.1 ¶ 36; MMC Chart at 115.)  Plaintiff also underwent a second 24 UFC and lab work for his testosterone levels.  (Epstein Defs.' 56.1 ¶¶ 36–38; MMC Chart at 108, 110, 115–17.)  On December 16, 2011 and January 6, 2012, respectively, Plaintiff was informed by letter that his 24 UFC was normal, but that his lab work was abnormal.  (Epstein Defs.' 56.1 ¶¶ 37–38; MMC Chart at 108, 110.)

On January 11, 2012, Plaintiff contacted Dr. Akwuba and requested an appointment with a urologist.  (Epstein Defs.' 56.1 ¶ 39; MMC Chart at 106.)  On January 17, 18, and 20, 2012, Plaintiff and Dr. Epstein exchanged messages; they finally connected on January 20, 2012, to discuss Plaintiff's abnormal lab work.  (Epstein Defs.' 56.1 ¶ 40; MMC Chart at 103.)  On three occasions in January 2012, Plaintiff contacted Dr. Akwuba's office to inquire about switching medications, but he was instructed to first make an appointment.  (Epstein Defs.' 56.1 ¶ 39; MMC Chart at 101–02, 105.)

On February 7, 2012, Plaintiff met with the urologist and was diagnosed with testicular hypofunction[11] and ED.  (Epstein

---

[11] Testicular hypofunction is a decreased or insufficient function of the testes.  See Hypofunction, Merriam-Webster's Online Dictionary,

Defs.' 56.1 ¶ 42; Ex. 10 to Epstein Defendants' Mem. of Law

("Urology Chart"), ECF No. 53-10, at 4.)  Plaintiff also

underwent a urinalysis,[12] which was negative for blood in the

urine.  (Epstein Defs.' 56.1 ¶ 42; Urology Chart at 11.)

On March 16, 2012, Plaintiff saw Dr. Akwuba for eczema and

hearing loss.  (Epstein Defs.' 56.1 ¶ 43; MMC Chart at 95–97.)

Plaintiff's weight was measured to be 167 lbs.  (MMC Chart at

96.)  Plaintiff was given an audiology referral, medication for

the rash, and he was instructed to return in one month.

(Epstein Defs.' 56.1 ¶ 43; MMC Chart at 95–97.)  A few days

later, on March 20, 2012, Plaintiff again met with the urologist

for ED.  (Epstein Defs.' 56.1 ¶ 44; Urology Chart at 2.)

Plaintiff reported the gradual onset of nocturia,[13] which he

described as constant, mild, and occurring in a persistent

pattern for one year.  (Urology Chart at 2.)  The urologist

suggested "life style changes for now."  (Id.)

Plaintiff called Dr. Akwuba for prescription refills in May

2012, December 2012, March 2013, and July 2013.  (Epstein Defs.'

---

https://www.merriam-webster.com/medical/hypofunction (last visited
Jan. 10, 2020).

[12] A urinalysis is a test of a patient's urine that is used to detect
and manage a wide range of disorders, such as urinary tract
infections, kidney disease, and diabetes. See Urinalysis, Mayo Clinic
Patient Care & Health Info, https://www.mayoclinic.org/tests-
procedures/urinalysis/about/pac-20384907 (last visited Jan. 10, 2020).

[13] Nocturia is "urination at night especially when excessive."
Nocturia, Merriam-Webster's Online Dictionary, https://www.merriam-
webster.com/medical/nocturia (last visited Jan. 10, 2020).

56.1 ¶ 45; MMC Chart at 133–36.)  At some point prior to
November 2013, Dr. Akwuba's office closed and Plaintiff became a
patient of Dr. Pittman at the Castle Hill Family Practice.  (Ex.
1 to Pl.'s 56.1 ("Pl. Dep. Tr."), ECF No. 66-4, at 66:15–67:8.)
Over the course of the next year, Dr. Pittman saw Plaintiff on
three occasions: November 20, 2013; December 31, 2013; and
November 7, 2014.  (Pl.'s 56.1 ¶ 82.)  By March 2015, however,
Plaintiff decided to transfer his care from Dr. Pittman to a
different provider because Plaintiff believed that Dr. Pittman
"wasn't doing anything for me."  (Pl. Dep. Tr. at 91:16–19.)

## 2. Plaintiff's Treatment by Drs. Pittman and Epstein

Plaintiff's first appointment with Dr. Pittman occurred on
November 20, 2013.  (Pl.'s 56.1 ¶ 4.)  During this appointment,
known as a "problem-focused visit",[14] Dr. Pittman's notes reflect
that Plaintiff presented with complaints of pain and
intermittent swelling of his right foot, which he sometimes felt
while walking.  (Id.; MMC Chart at 130.)  Plaintiff testified
during his deposition that, during the visit with Dr. Pittman,
Plaintiff also complained of weight loss, frequent urination,
and eating small portions and feeling full fast.  (Pl.'s 56.1 ¶

---

[14] Plaintiff's expert witness, Kenneth R. Ackerman, M.D. ("Dr.
Ackerman"), testified that a patient will receive a "problem-focused
exam" when the patient presents with a specific complaint.  (USA's
56.1 ¶ 38; Ex. 5 to Pl.'s 56.1 ("Ackerman Dep. Tr."), ECF No. 66-8, at
76:21–78:13.)

4.)  Dr. Pittman's notes, however, do not list such complaints and do not indicate that Plaintiff's weight was even measured during the visit.  (MMC Chart 130–32.)  Dr. Pittman's notes reflect that she advised Plaintiff to ice his foot regularly, begin taking daily ibuprofen, apply a topical muscle cream, and, if the pain persisted, to contact the clinic to set up an x-ray.  (Pl.'s 56.1 ¶ 5; MMC Chart at 132.)

On December 31, 2013, Plaintiff was examined by Dr. Pittman for his annual physical.  (USA's 56.1 ¶ 6.)  Plaintiff's weight was measured to be 166 lbs.  (Id. ¶ 7.)  Dr. Pittman's notes reflect that Plaintiff said he was still experiencing foot pain, and the two discussed Plaintiff's history of HTN, pituitary microadenoma, ED, and hypogonadism.  (MMC Chart at 142.)  Plaintiff requested another referral to urology.  (Id.)  Various blood tests were performed, and Dr. Pittman referred Plaintiff to a podiatrist for his foot, an endocrinologist for his microadenoma, and a urologist for his ED.  (USA's 56.1 ¶ 8; MMC Chart at 142.)  Dr. Pittman, however, did not order a complete blood count ("CBC")[15] or a urinalysis.  (Pl.'s 56.1 ¶ 8.)

On January 22, 2014, Plaintiff saw the urologist for his

_____

[15] A complete blood count, or a "CBC", is a blood test that is used to evaluate a patient's overall health and to detect a wide range of disorders, including anemia, infection, and leukemia. See Complete Blood Count (CBC), Mayo Clinic Patient Care & Health Info, https://www.mayoclinic.org/tests-procedures/complete-blood-count/about/pac-20384919 (last visited Jan. 10, 2020).

ED.  (Epstein Defs.' 56.1 ¶ 48; Urology Chart at 6–7.)

Plaintiff was given a prescription for Cialis and instructed to

return for a follow-up visit in three months.  (Epstein Defs.'

56.1 ¶ 48; Urology Chart at 7.)  Plaintiff also underwent

another urinalysis, which was negative for blood in the urine.

(Epstein Defs.' 56.1 ¶ 48; Urology Chart at 12.)  Plaintiff saw

the podiatrist for his foot pain on January 28, 2014.  (Epstein

Defs.' 56.1 ¶ 49; MMC Chart at 153–56.)

On April 8, 2014, Plaintiff saw Dr. Epstein, the

endocrinologist, for his low testosterone, ED, and microadenoma.

(USA's 56.1 ¶ 9.)  Plaintiff's weight was measured to be 165

lbs.  (Id. ¶ 10.)  Under "Review of Symptoms" Dr. Epstein noted

that Plaintiff complained of frequent urination but that he

denied change in weight or change in appetite.  (MMC Chart at

183.)  Several blood tests were performed during the visit,

including a CBC which showed mild anemia; specifically: a low

hemoglobin of 12.8 (lab range for normal was 14.0–17.4) and a

hematocrit of 39.6 (lab range for normal was 41.5–50.4).  (USA's

56.1 ¶ 11.)  Dr. Epstein also performed a test for lactate

dehydrogenase ("LDH"),[16] which was found to be elevated at 257

---

[16] LDH, also known as lactic acid, is an enzyme that plays an important role in making the body's energy. See Lactate Dehydrogenase (LDH) Test, MedlinePlus, https://medlineplus.gov/lab-tests/lactate-dehydrogenase-ldh-test/ (last visited Jan. 10, 2020).  LDH is found in certain tissues in the body, including the blood, heart, kidneys, brain, and lungs. See id.  When these tissues are damaged, they release LDH into the bloodstream or other body fluids. See id.

(lab range for normal was 110–210). (Id.) Testing of
Plaintiff's kidney function was normal. (Id.)

On April 25, 2014, Plaintiff underwent a follow-up MRI to
assess his pituitary microadenoma, which showed that it was
stable. (Epstein Defs.' 56.1 ¶ 54; MMC Chart at 164–65.) On
April 23, 2014, two days prior to the MRI, Dr. Epstein called
Plaintiff and left a message regarding some of Plaintiff's lab
results, including his elevated LDH. (Epstein Defs.' 56.1 ¶ 53;
MMC Chart at 166.) Dr. Epstein's notes further reflect that, on
May 1, 2014, Dr. Epstein called Plaintiff and left a second
message regarding many of the same topics as his April 23, 2014
call. (Epstein Defs.' 56.1 ¶ 55; MMC Chart at 163.) Dr.
Epstein's notes state that Plaintiff "has anemia" and he needed
"to see pmd [primary medical doctor, i.e., Dr. Pittman] for
colonoscopy, etc." (Pl.'s 56.1 ¶ 97; MMC Chart at 163.)

Dr. Epstein's notes next reflect that, on May 5, 2014, Dr.
Epstein spoke with Plaintiff and they put a "plan in place."
(MMC Chart at 163.) In addition to other topics relating to
Plaintiff's test results, Dr. Epstein's notes state that
Plaintiff "will d/w [discuss with] his pmd his anemia - reports

---

Elevated LDH levels may signify that certain tissues have been damaged
by disease or injury. See id. Plaintiff's expert, Dr. Ackerman,
testified that LDH is an "inflammatory marker" that may be elevated in
certain conditions, including strenuous exercise. (Ackerman Dep. Tr.
at 32:6–33:10.)

not being up to date colonoscopy [sic]." (Id.) Plaintiff,
however, denies that Dr. Epstein ever told him about the finding
of anemia or that he should discuss the finding with Dr.
Pittman. (Pl.'s 56.1 ¶ 12.)

Dr. Epstein electronically signed his May 1, and May 5,
2014 call notes and sent them to Dr. Pittman along with the CBC
results. (Id. ¶ 95; MMC Chart at 163, 180–81.) On June 6,
2014, Plaintiff called Dr. Pittman's office and left a message
asking to speak with her. (Epstein Defs.' 56.1 ¶ 59; MMC Chart
at 199.) Later that day, Dr. Pittman returned Plaintiff's call,
but she did not connect with him. (Epstein Defs.' 56.1 ¶ 60;
MMC Chart at 199.)

On June 22, 2014, Dr. Pittman electronically signed-off on
Dr. Epstein's call notes and the CBC results. (Pl.'s 56.1 ¶ 96;
MMC Chart at 163, 181.) During her deposition, Dr. Pittman
acknowledged that, although she received Plaintiff's laboratory
test results, which required an investigation and follow-up,
when she next saw Plaintiff—which turned out to be the last time
that she would see him as a patient—Dr. Pittman did not perform
any type of investigation into the results, such as the findings
of anemia or elevated LDH. (Pl.'s 56.1 ¶¶ 83, 99; Ex. 2 to
Pl.'s 56.1 ("Pittman Dep. Tr."), ECF No. 66-5, at 17:24–18:16,
146:10–13.)

On November 7, 2014, Plaintiff returned to Dr. Pittman for

a flu shot and a second problem-focused visit. (Pl.'s 56.1 ¶
13; MMC Chart at 204-08.) Dr. Pittman treated Plaintiff for
chest pain and tingling in his left arm the day prior, which
Plaintiff was concerned was a heart attack. (Pl.'s 56.1 ¶ 13;
MMC Chart at 204.) Plaintiff testified during his deposition
that he also complained of weight loss, frequent urination, and
eating small portions and feeling full fast during the visit,
but Dr. Pittman's notes do not list such complaints. (Pl.'s
56.1 ¶ 13; MMC Chart at 204-08.) Plaintiff's weight was
measured to be 160 lbs. (USA's 56.1 ¶ 14.) An EKG was
performed which showed no sign of abnormality. (Id. ¶ 15.)
Plaintiff was instructed to follow up if his symptoms worsened
and to return in one month for a blood pressure check. (Id. ¶
16.)

On December 10, 2014,[17] Plaintiff missed a scheduled
appointment with Dr. Pittman. (Pl.'s 56.1 ¶ 17; MMC Chart at
212.) The following day, Dr. Pittman's office sent a letter to
Plaintiff requesting that he call to reschedule the appointment.
(USA's 56.1 ¶ 18; MMC Chart at 212.) Plaintiff, however, does
not appear to have ever returned to Dr. Pittman. (Pl. Dep. Tr.
at 68:20-23, 85:21-86:4, 157:23-158:4, 165:6-17 (stating the

---

[17] The Government's 56.1 statement states that Plaintiff missed his
appointment on December 11, 2014, but the letter Dr. Pittman's office
sent to Plaintiff indicates that the appointment was on December 10,
2014. (USA's 56.1 ¶ 17; MMC Chart at 212.)

last time Plaintiff saw Dr. Pittman was in late 2014).) On
February 3, 2015, Plaintiff also missed his nine-month follow-up
appointment with Dr. Epstein. (Epstein Defs.' 56.1 ¶ 66; MMC
Chart at 211.) Plaintiff does not appear to have ever returned
to Dr. Epstein after the April 8, 2014 visit. (Pl. Dep. Tr. at
85:14–16.)

### 3. Plaintiff's Kidney Cancer Diagnosis and Treatment

On March 26, 2015, Plaintiff was seen by Dr. Pamela
Charney, an internal medicine doctor at Weill Cornell. (USA's
56.1 ¶ 19.) Plaintiff's weight was measured to be 158 lbs.
(Id. ¶ 20.) Dr. Charney's notes reflect that Plaintiff's chief
complaint was hypertension and that he had been seeing Dr.
Pittman, but he was "concerned about lack of attention to health
issues." (Ex. 9 to Pl.'s 56.1 ("Weill Cornell Chart"), ECF No.
66-12, at 1.) Plaintiff also complained of weight loss, telling
Dr. Charney that that he "[w]as for years 181 lbs[.]" and that
"Dr. Pittman just reassured, but he was concerned. Eating less
for about one year . . . all portions are smaller . . . stomach
fills up quick. . . . Notices four months ago 162 lbs." (Id. at
2.) Plaintiff also reported that "[l]ast four months more tired
than before, napping more after work for last four months. . . .
Sleeps more on weekend." (Id.) Dr. Charney's assessment noted
that Plaintiff had poor control of his HTN, he needed to

regularly take his medication, and he needed to return for a follow-up visit on April 2, 2015. (Id. at 4.) Dr. Charney also referred Plaintiff to a gastroenterologist for an EGD[18] and a colonoscopy for his complaints of early satiety, and she ordered several blood tests to investigate his weight loss and fatigue, including a CBC. (Id.)

On April 2, 2015, Plaintiff returned to Dr. Charney for his follow-up appointment. (Pl.'s 56.1 ¶ 21.) Dr. Charney's April 2, 2015 notes, (Weill Cornell Chart at 23–26), include much of the same information as her March 26, 2015 notes, (Weill Cornell Chart at 1–4), and they reflect that Plaintiff represented substantial weight loss of 27 pounds over the prior six months, and Dr. Charney's referral of Plaintiff to Dr. Sonja Olsen, the gastroenterologist, for an upper and lower gastrointestinal ("GI") tract endoscopy. (USA's 56.1 ¶ 22.) Dr. Charney also ordered additional blood tests to investigate Plaintiff's anemia, including serum protein electrophoresis, iron studies, B12, and folate. (Pl.'s 56.1 ¶ 106.) During her deposition, Dr. Charney stated that she decided to first focus on Plaintiff's stomach but "[t]here is more than one way to do

---

[18] An esophagogastroduodenoscopy, or an "EGD", "is a test to examine the lining of the esophagus, stomach, and first part of the small intestine." EGD, MedlinePlus, https://medlineplus.gov/ency/article/003888.htm (last visited Jan. 10, 2020).

things in medicine" and the treatment could have begun with abdominal imaging. (Id. ¶ 111; Ex. 2 to Pl.'s 56.1 ("Charney Dep. Tr."), ECF No. 66-7, at 32:3–24.)

On May 20, 2015, Plaintiff saw Dr. Olsen, who noted a need to schedule a screening colonoscopy and upper GI endoscopy. (USA's 56.1 ¶ 23.) Dr. Olsen also noted, for the first time, that Plaintiff's liver was palpable on exam, and she ordered a sonogram to assess it. (Pl.'s 56.1 ¶ 24.) On June 2, 2015, Plaintiff had an abdominal sonogram of his liver during which the study incidentally revealed two masses on his kidneys. (USA's 56.1 ¶¶ 25–26.) On June 4, 2015, Plaintiff had both his colonoscopy and upper GI endoscopy. (Id. ¶ 27.) Both were negative for pathology. (Id.) On June 8, 2015, a CT scan was performed which showed a mass on each kidney, both of which were deemed suspicious for cancer. (Id. ¶ 28.) On June 18, 2015, Plaintiff underwent surgery to partially remove the mass on his left kidney. (Id. ¶ 29.) A subsequent pathology report showed that Plaintiff's cancer was fully contained within the portion of the kidney that had been removed. (Id. ¶ 30.) On October 1, 2015, Plaintiff underwent a second surgery to remove his entire right kidney because the tumor occupied 95 percent of the kidney

and a partial nephrectomy[19] was not able to be performed. (Id. ¶
31; Pl.'s 56.1 ¶ 116.) Dr. Charney testified during her
deposition that Plaintiff's current, continued renal failure is
his biggest health problem due to the significant amount of
kidney mass that was removed. (Pl.'s 56.1 ¶ 118; Charney Dep.
Tr. at 39:3-13.)

### B. Expert Reports

The parties have submitted numerous expert reports. Only
the admissibility of Plaintiff's experts is at issue.
Accordingly, the Court only focuses on Plaintiff's experts'
reports and deposition testimony at length.

### 1. Dr. Ackerman

Plaintiff served an expert report from Kenneth R. Ackerman,
M.D. ("Dr. Ackerman"). (Ex. 10 to Pl.'s 56.1 ("Ackerman
Report"), ECF No. 66-13.) Dr. Ackerman's report states that he
was board certified in internal medicine in 1991, and he holds a
current instructor position at Hofstra University School of
Medicine. (Id. at 1.) Dr. Ackerman's curriculum vitae, which
Plaintiff provided along with Dr. Ackerman's report, states that
he received a M.D. with distinction from Stony Brook School of
Medicine in 1988, he conducted his internship and residency in

---

[19] Nephrectomy is "the surgical removal of a kidney." Nephrectomy,
Merriam-Webster's Online Dictionary, https://www.merriam-
webster.com/dictionary/nephrectomy (last visited Jan. 10, 2020).

primary care internal medicine at North Shore University Hospital in Manhasset, New York from 1988 to 1991, and he has been licensed to practice medicine in the State of New York since 1989. (Curriculum Vitae, ECF No. 66-13, at ECF Page 4 of 5.) From 1991 to 2007, Dr. Ackerman was in private practice at Solo Internal Medicine in Great Neck, New York. (Id.) From 2007 to the present, Dr. Ackerman has worked at ProHEALTH Care Associates in Great Neck, New York. (Id.)

Dr. Ackerman's report states that he "reviewed the records of Montefiore Medical Center, NY Presbyterian Hospital and the various pathology reports in preparing [his] response," and that he was very familiar with the layout and documentation provided by the electronic medical records used by MMC. (Ackerman Report at 1.) Dr. Ackerman's report states that he based his opinion "on the general practice of medicine and standards in the [c]ommunity." (Id.)

Dr. Ackerman reports that Plaintiff was under the care of Drs. Pittman and Epstein "for various issues including hypertension, panhypopituitarism[,[20]] and gout[[21]]" and that

---

[20] Panhypopituitarism is "generalized secretory deficiency of the anterior lobe of the pituitary gland." Panhypopituitarism, Merriam-Webster's Online Dictionary, https://www.merriam-webster.com/medical/panhypopituitarism (last visited Jan. 10, 2020).

[21] Gout is "a metabolic disease marked by a painful inflammation of the joints, deposits of urates in and around the joints, and usually an excessive amount of uric acid in the blood." Gout, Merriam-Webster's

Plaintiff's "main complaint during that time was sexual dysfunction." (Id.)  Dr. Ackerman also noted that "Dr. Pittman did a physical examination on 12/31/13 in which some testing was done but absent from the examination was a urinalysis and a prostate exam."  (Id.)[22]

Dr. Ackerman concluded that the main deviations from the standard of care were Drs. Pittman and Epstein's "fail[ures] to perform basic and routine examinations which caused a significant delay in diagnosis for the patient." (Id. at 2.) Dr. Ackerman identified two specific deviations that, in his opinion, caused a delay in Plaintiff's kidney cancer diagnosis: First, Drs. Pittman and Epstein failed to perform a urinalysis of Plaintiff and, "[a]s a result, no hematuria[23] was ever

_____

Online Dictionary, https://www.merriam-webster.com/dictionary/gout (last visited Jan. 10, 2020).

[22] Dr. Ackerman's report also included two statements of fact that he later acknowledged were incorrect.  First, Dr. Ackerman's report stated: "Urology consul[t]ation was recommended but was never undertaken despite [Plaintiff's] complaints of significant urinary frequency." (Ackerman Report at 1.)  During his deposition, however, Dr. Ackerman admitted that Plaintiff never complained to Dr. Pittman of urinary frequency, and his statement regarding urology consultation was incorrect.  (Ackerman Dep. Tr. at 94:8-95:19.)  Second, Dr. Ackerman's report repeatedly stated that, while Plaintiff was under the care of Drs. Pittman and Epstein, no urinalysis of Plaintiff was ever performed.  (Ackerman Report at 1.)  During his deposition, however, Dr. Ackerman acknowledged that, although Drs. Pittman and Epstein never ordered a urinalysis of Plaintiff, one or more may have been performed by a different provider during the relevant time period.  (Ackerman Dep. Tr. at 89:4-7, 93:16-23.)

[23] Hematuria is "the presence of blood or blood cells in the urine." Hematuria, Merriam-Webster's Online Dictionary, https://www.merriam-webster.com/dictionary/hematuria (last visited Jan. 10, 2020).

picked up during routine examination which would have been an
early indicator of [r]enal [c]ell [c]arcinoma." (Id. at 1.)
Second, Drs. Pittman and Epstein failed to investigate "[m]any
clues leading to the diagnosis of renal cell carcinoma," such as
Plaintiff's weight loss, elevated LDH, and anemia. (Id.) Dr.
Ackerman's report does not explain how "clues" such as weight
loss, elevated LDH, or anemia are an early indicator of renal
cell carcinoma, nor how an investigation of such "clues" would
have led to an early diagnosis of Plaintiff's cancer.

During Dr. Ackerman's deposition he testified that there
was no violation of the standard of care during Plaintiff's
November 20, 2013 visit to Dr. Pittman. (USA's 56.1 ¶ 39.) Dr.
Ackerman, however, opined that Dr. Pittman should have performed
a CBC and a urinalysis during Plaintiff's December 31, 2013
visit. (Id. ¶ 40.)

Regarding Dr. Pittman's failure to order a urinalysis, Dr.
Ackerman acknowledged that all of the urinalyses that Plaintiff
underwent between 2011 and 2014 did not test positive for blood
in the urine, but he opined that blood in the urine can be
intermittent depending on a variety of factors, and it was
possible that Plaintiff could have tested positive if Dr.
Pittman had ordered the test. (Ex. 5 to Pl.'s 56.1 ("Ackerman
Dep. Tr."), ECF No. 66-8, at 86:4–87:10.) Regarding Dr.
Pittman's failure to order a CBC, Dr. Ackerman opined that Dr.

23

Pittman also should have investigated Plaintiff's April 2014 CBC results, including the finding of anemia, by performing a "work up" after she received the information from Dr. Epstein. (USA's 56.1 ¶¶ 40, 42; Pl.'s 56.1 ¶ 123.) Dr. Ackerman explained that such a "work up" would have included tests to see whether Plaintiff was iron deficient, as well as an examination of Plaintiff's gastrointestinal tract. (Pl.'s 56.1 ¶ 123; Ackerman Dep. Tr. 41:3–42:13.) Dr. Ackerman, however, acknowledged that the tests Dr. Charney ordered in response to similar laboratory results—i.e., to refer Plaintiff to a gastroenterologist for an endoscopy and a colonoscopy—were not related to potentially diagnosing Plaintiff's renal cell carcinoma. (Ackerman Dep. Tr. at 92:22–24, 112:14–25.) Finally, Dr. Ackerman opined that the December 2014 appointment, which Plaintiff subsequently missed, was a routine care, regular check-up appointment. (Pl.'s 56.1 ¶ 43.)

Regarding the "clues" that Drs. Pittman and Epstein missed, Dr. Ackerman testified that Plaintiff's weight loss was not significant because he only lost approximately five pounds over the relevant period and, aside from Plaintiff's representation to Dr. Charney that he had previously weighed 181 pounds, there is no evidence that Plaintiff was ever measured at that weight. (USA's 56.1 ¶¶ 46–47.) Next, Dr. Ackerman testified that LDH is non-specific, it may be associated with many conditions, and

"[i]t's not a marker for renal cell cancer." (Ackerman Dep. Tr. at 91:24–92:16.) Dr. Ackerman also conceded that a diagnosis of renal cell carcinoma could not be based on an elevated LDH level alone. (USA's 56.1 ¶ 50.) Finally, Dr. Ackerman testified that he was "not necessarily convinced that significant anemia is a marker for renal cell carcinoma at all," but that severe anemia "can be consistent with" renal cell carcinoma, as well as "with a lot of different things." (Ackerman Dep. Tr. at 38:3–21.)

### 2. Dr. Davies

Plaintiff also served an expert report from Benjamin J. Davies, M.D. ("Dr. Davies"). (Ex. 11 to Pl.'s 56.1 ("Davies Report"), ECF No. 66-14.) Dr. Davies's report states that he was board certified in urology in 2010, and he is a practicing Associate Professor of Urologic Oncology at the University of Pittsburgh. (Id. at 1.) Dr. Davies's medical practice is exclusive to urologic oncology and he regularly treats patients with renal cell carcinoma. (Id.) Dr. Davies's report states that he was "retained to express an[] opinion about the potential consequences of a delayed diagnosis regarding renal cell carcinoma" and "to opine on the apparent delay in [Plaintiff's] diagnosis of just over a year from the time of significant anemia noted in April 2014[,] to his eventual diagnosis of bilateral kidney tumors in June 2015." (Id. at 1, 2.) Dr. Davies's report states that he reviewed the depositions

of Drs. Pittman and Epstein, as well as a variety of medical records, including Dr. Charney's clinic records and the MMC records of Drs. Pittman and Epstein. (Id. at 1.)

After providing a brief summary of Plaintiff's medical and urologic oncology history, Dr. Davies's report opined that (1) had the renal tumors been found one year earlier, Plaintiff's chronic renal failure would have been substantially improved or not even present; (2) large tumors such as those found in Plaintiff grow at a rate of 2 centimeters to 4 centimeters per year; and (3) the alleged one-year delay in diagnosis caused Plaintiff to lose significant renal mass. (USA's 56.1 ¶ 59.) Dr. Davies further testified that it is more likely than not that Plaintiff's kidney tumors were substantially smaller the year before they were diagnosed. (Pl.'s 56.1 ¶ 133.)

During Dr. Davies's deposition he observed that Plaintiff's anemia was a significant medical finding, but Dr. Davies nevertheless repeatedly stressed that he had no opinion regarding whether Drs. Pittman or Epstein committed malpractice or whether any breach of a relevant standard of care caused a delay in Plaintiff's renal cell carcinoma diagnosis. (Ex. 6 to Pl.'s 56.1 ("Davies Dep. Tr."), ECF No. 66-9, at 108:7–19 ("Q. Okay. And just to be clear, are you testifying today and is it your opinion that both Dr. Pittman and Dr. Epstein committed malpractice? A. I—to be honest, I think my opinion is based on—

I don't think my opinion is on malpractice.  My opinion is an
expert as to what happened if this was caught one year earlier.
So, I am an expert opinion as to delay in diagnosis.  I am not
giving any opinions as to specific primary care problems with
hematuria or weight loss."), 112:11–113:4, 113:15–114:7, 119:19–
120:4, 122:25–123:6.)

### 3. Dr. Schwimmer

The Government served an expert report from Joshua A.
Schwimmer, M.D. ("Dr. Schwimmer"), (Ex. 8 to Decl. of Kirti
Vaidya Reddy ("Schwimmer Report"), ECF No. 59-7), who was
retained by the Government to assess Dr. Pittman's care.  (USA's
56.1 ¶ 62.)  Dr. Schwimmer is a board-certified, full-time
practicing nephrologist[24] and internist,[25] who commonly sees
patients in clinical practice with anemia, elevated LDH, kidneys
that have been partially or totally removed, and chronic kidney
disease.  (Id. ¶ 63.)

Dr. Schwimmer's report states that Dr. Pittman did not
breach the relevant standard of care during the December 2013
visit by failing to perform tests for weight loss or to order a
CBC or urinalysis.  (Id. ¶ 64.)  Dr. Schwimmer also opined that

---

[24] A nephrologist is a specialist in the kidneys. See Nephrology,
Merriam-Webster's Online Dictionary, https://www.merriam-
webster.com/dictionary/nephrologist (last visited Jan. 10, 2020).

[25] An internist is a specialist in internal medicine. Internist,
Merriam-Webster's Online Dictionary, https://www.merriam-
webster.com/dictionary/internist (last visited Jan. 10, 2020).

had a urinalysis been performed in December 2013, it is more likely than not that the urinalysis would not have shown blood in Plaintiff's urine because none of Plaintiff's urinalyses tested positive for blood.  (Id. ¶ 65.)

Regarding the November 2014 visit, Dr. Schwimmer opined that Dr. Pittman's failure to investigate Plaintiff's weight loss did not breach the standard of care because Plaintiff's change in weight was not clinically significant.  (Id. ¶ 66.) Regarding anemia, Dr. Schwimmer opined that Dr. Pittman did not breach the standard of care by assuming that Plaintiff's low blood count—which, according to Dr. Schwimmer, was within the normal range when accounting for Plaintiff's race, age, and sex— did not require an urgent or immediate evaluation.  (Id. ¶ 67; Schwimmer Report at 13–14.)  Dr. Schwimmer further opined that had Dr. Pittman ordered a colonoscopy or endoscopy in November 2014, or during a previous visit, the tests would not have identified Plaintiff's cancer.  (Schwimmer Report at 14.) Regarding LDH, Dr. Schwimmer opined that elevated LDH is very common, it is not specific to any type of disease, and it is unlikely to have been caused by kidney cancer.  (USA's 56.1 ¶ 71.)  Finally, Dr. Schwimmer testified that Plaintiff's kidney cancer was identified not because of an investigation into his weight loss or anemia, but rather, because Dr. Olsen believed that Plaintiff's liver was enlarged and the ultrasound of his

28

liver that she performed happened to incidentally visualize the kidney cancer. (Ex. 10 to Decl. of Kirti Vaidya Reddy ("Schwimmer Dep. Tr."), ECF No. 59-8, at 111:19–112:4.)

### 4. Dr. Hyams

The Government also served an expert report from Elias M. Hyams, M.D. ("Dr. Hyams"). (Ex. 10 to Decl. of Kirti Vaidya Reddy ("Hyams Report"), ECF No. 59-9.) Dr. Hyams is an Associate Professor of Urology at Columbia University Medical Center who assessed this matter on the Government's behalf. (Id. at 1; USA's 56.1 ¶ 75.) Dr. Hyams noted that there was no objectively significant decrease in Plaintiff's weight while he was under Dr. Pittman's care. (USA's 56.1 ¶ 77.) Dr. Hyams further opined that anemia is common, occurring in 5.6 percent of the U.S. population, it has a very broad differential diagnosis, and it is only present in 33 percent of patients with renal cancer. (Id. ¶ 79.) Dr. Hyams concluded that "Dr. Pittman did not breach the standard of care because there was no[] significant weight loss or other signs/symptoms to prompt concern for kidney cancer, there were only mild laboratory abnormalities (anemia, LDH elevation) that were non-specific, and the ultimate outcome of surgery and chronic kidney disease were likely to ensue regardless of the timing of detection." (Hyams Report at 6.)

### 5.  Drs. Rosenthal and DeCastro

Finally, the Epstein Defendants served expert reports from David S. Rosenthal, M.D. ("Dr. Rosenthal") and Guarionex J. DeCastro, M.D. ("Dr. DeCastro"), both of whom opined that Dr. Epstein treated Plaintiff within the bounds of good and accepted medical care and never caused any of Plaintiff's injuries.  (Ex. 26 to Defs.' Mem. of Law ("Rosenthal Report"), ECF No. 53-26; Ex. 27 to Defs.' Mem. of Law ("DeCastro Report"), ECF No. 53-27.)

### C.  Procedural History

On or about July 7, 2016, Plaintiff filed a FTCA administrative claim with the U.S. Department of Health and Human Services seeking personal injury damages of $10 million. (Ex. 13 to Decl. of Kirti Vaidya Reddy, ECF No. 59-12.) Plaintiff's FTCA claim was denied and on July 11, 2017, he initiated this action by filing the Complaint.  (ECF No. 1.)  On August 24, 2017, Dr. Epstein filed an answer.  (ECF No. 24.)  On December 26, 2017 and January 17, 2018, the parties filed stipulations dismissing certain defendants from this action, such as Dr. Pittman and the Montefiore Medical Group.  (ECF Nos. 31, 32.)  On February 9, and February 21, 2018, respectively, MMC and the Government filed their answers.  (ECF Nos. 33, 34.) On December 27, 2018, the action was stayed pending restoration of funding to the Department of Justice; the stay was lifted on

January 28, 2019.

On August 20, and August 22, 2019, respectively, the
Epstein Defendants and the Government filed motions for summary
judgment. (ECF Nos. 51, 56.) On October 16, 2019, the Court
granted Plaintiff's request for leave to file oversized
briefing. (ECF No. 65.) On October 18, 2019, Plaintiff filed
an opposition to the Government's summary judgment motion, (ECF
No. 66); Plaintiff did not file an opposition to the Epstein
Defendants' motion. On November 22, 2019, the Government filed
a reply and the Epstein Defendants filed a letter notifying the
Court that no party had opposed their motion. (ECF Nos. 69,
70.) On December 3, 2019, the Court emailed Plaintiff's counsel
and inquired whether Plaintiff intended to oppose the Epstein
Defendants' summary judgment motion. Plaintiff's counsel
informed the Court that Plaintiff did not oppose the Epstein
Defendants' motion.

On December 16, 2019, the Court ordered the parties to
provide supplemental briefing regarding the standard for
assessing whether an expert witness' proffered testimony is
impermissibly speculative, and whether any relevant authority
has addressed a fact pattern similar to this case. (ECF No.
72.) Plaintiff and the Government filed their responses on
January 3, 2020, (ECF Nos. 73, 74); the Epstein Defendants filed
their response on January 4, 2020, (ECF No. 75). The Court

heard oral argument on January 9, 2020, during which Plaintiff's counsel consented to the dismissal of the Epstein Defendants. The Court entered an order to that effect on January 13, 2020, (ECF No. 76), and the case caption was revised to list the Government as the only remaining defendant in this action.

## II. Discussion

### A. Standard of Review

Summary judgment is appropriate where the moving party shows that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see also Psihoyos v. John Wiley & Sons, Inc., 748 F.3d 120, 123-24 (2d Cir. 2014). "In determining whether summary judgment is appropriate," a court must "construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant." Brod v. Omya, Inc., 653 F.3d 156, 164 (2d Cir. 2011) (quotation marks omitted); see also Borough of Upper Saddle River, N.J. v. Rockland Cty. Sewer Dist. #1, 16 F. Supp. 3d 294, 314 (S.D.N.Y. 2014) (same). If, even viewed in this light, there is not "sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party," or "[i]f the evidence . . . is not significantly probative, summary judgment may be granted." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249-50 (1986) (citations omitted).

"It is the movant's burden to show that no genuine factual dispute exists." Vt. Teddy Bear Co., Inc. v. 1-800 Beargram Co., 373 F.3d 241, 244 (2d Cir. 2004); see also Berry v. Marchinkowski, 137 F. Supp. 3d 495, 521 (S.D.N.Y. 2015) (same). "However, when the burden of proof at trial would fall on the nonmoving party, it ordinarily is sufficient for the movant to point to a lack of evidence to go to the trier of fact on an essential element of the nonmovant's claim," in which case "the nonmoving party must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment." CILP Assocs., L.P. v. PriceWaterhouse Coopers LLP, 735 F.3d 114, 123 (2d Cir. 2013) (alteration and internal quotation marks omitted). Further, to survive a summary judgment motion, a nonmovant "need[s] to create more than a 'metaphysical' possibility that his allegations [a]re correct; he need[s] to 'come forward with specific facts showing that there is a genuine issue for trial.'" Wrobel v. Cty. of Erie, 692 F.3d 22, 30 (2d Cir. 2012) (emphasis omitted) (quoting Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586–87 (1986)). The nonmoving party "may not merely rest on the allegations or denials of his pleading." Wright v. Goord, 554 F.3d 255, 266 (2d Cir. 2009); see also Guardian Life Ins. Co. v. Gilmore, 45 F. Supp. 3d 310, 322 (S.D.N.Y. 2014) (same).

"On a motion for summary judgment, a fact is material if it might affect the outcome of the suit under the governing law." Royal Crown Day Care LLC v. Dep't of Health & Mental Hygiene, 746 F.3d 538, 544 (2d Cir. 2014) (internal quotation marks omitted). At this stage, "[t]he role of the court is not to resolve disputed issues of fact but to assess whether there are any factual issues to be tried," Brod, 653 F.3d at 164 (quotation marks omitted), and "to isolate and dispose of factually unsupported claims," Geneva Pharm. Tech. Corp. v. Barr Labs. Inc., 386 F.3d 485, 495 (2d Cir. 2004) (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 323–24 (1986)). "[O]nly admissible evidence need be considered by the trial court in ruling on a motion for summary judgment." Presbyterian Church of Sudan v. Talisman Energy, Inc., 582 F.3d 244, 264 (2d Cir. 2009) (quotation marks omitted).

## B.  The Epstein Defendants' Motion

With the consent of Plaintiff's counsel, the Epstein Defendants were dismissed from this action on January 13, 2020. (ECF No. 76.)  Prior to their dismissal, however, the Epstein Defendants had argued that they were entitled to summary judgment because no genuine dispute existed regarding whether they committed medical malpractice.  Plaintiff did not oppose the motion, and the Court will briefly address its merits below.

"Under New York law, the essential elements of medical

malpractice are (1) a deviation or departure from accepted medical practice, and (2) evidence that such departure was a proximate cause of injury." Ongley v. St. Lukes Roosevelt Hosp. Ctr., 725 F. App'x 44, 46 (2d Cir. 2018) (summary order) (internal quotation marks omitted); see also Junger v. Singh, 393 F. Supp. 3d 313, 321 (W.D.N.Y. 2019) (same). "A medical malpractice defendant is prima facie entitled to summary judgment if it demonstrates that it did not depart from good and accepted medical practice or that any departure did not proximately cause plaintiff's injuries." Ongley, 725 F. App'x at 46 (internal quotation marks omitted); see also Junger, 393 F. Supp. 3d at 321.

The Court finds that the Epstein Defendants were entitled to summary judgment and dismissal from this action, regardless of Plaintiff's counsel's consent, because the record shows that no genuine dispute existed regarding whether Dr. Epstein deviated or departed from accepted medical practice: After Plaintiff was referred to Dr. Epstein for his low testosterone, ED, and microadenoma, Dr. Epstein ordered a CBC before placing Plaintiff on a testosterone replacement program. Upon receiving Plaintiff's abnormal CBC results, Dr. Epstein's notes reflect that he called Plaintiff and left messages regarding the test results, and he later spoke with Plaintiff about the abnormal results. Dr. Epstein then forwarded his call notes and the CBC

results to Plaintiff's primary physician, Dr. Pittman.
Plaintiff did not dispute the appropriateness of Dr. Epstein's
actions.  Further, the Epstein Defendants' experts (Drs.
Rosenthal and DeCastro), as well as Plaintiff's expert (Dr.
Ackerman), all testified that Dr. Epstein fulfilled his duty to
Plaintiff by ordering the CBC and sending the results to Dr.
Pittman.  Plaintiff did not dispute the accuracy of Drs.
Rosenthal, DeCastro, or Ackerman's conclusions either.

Accordingly, no genuine dispute existed regarding whether
the Epstein Defendants committed medical malpractice.  Summary
judgment in their favor, and their dismissal from this action,
is appropriate.

### C.  The Government's Motion

The Government's principal argument in support of summary
judgment is that Plaintiff has failed to offer admissible expert
testimony to prove that Dr. Pittman's alleged negligence was the
proximate cause of a delay in Plaintiff's kidney cancer
diagnosis.  Specifically, the Government argues that Dr.
Ackerman's opinion is impermissibly speculative and,
accordingly, it is inadmissible under the reliability
requirements of Federal Rule of Evidence 702.  Without Dr.
Ackerman's testimony, the Government argues, Plaintiff has
failed to establish an essential element of his claim and
summary judgment must be granted in its favor.

Plaintiff argues the opposite: namely, that Dr. Ackerman's opinion is admissible because (1) blood in the urine can be intermittent and thus, the urinalysis that Dr. Pittman failed to order could have tested positive, which would have led to an examination of Plaintiff's kidneys and the timely diagnosis of his cancer; (2) the "work up" of Plaintiff's anemia, that Dr. Pittman should have performed after (a) ordering a CBC test in December 2013 (which she did not do), or (b) receiving the abnormal test results from Dr. Epstein in May 2014 (which she allegedly ignored), would have led to an examination of Plaintiff's gastrointestinal tract, which could have started with abdominal imaging that would have revealed the masses on Plaintiff's kidneys; and (3) the investigation of Plaintiff's abnormal test results (i.e., the findings of anemia and elevated LDH), which Dr. Pittman should have performed, could have led to a timely discovery of Plaintiff's cancer because cancer is in the differential diagnosis for a patient with similar test results who also complains of weight loss and early satiety.

## 1. Legal Standards

### a. Medical Malpractice

"[T]he FTCA defines the liability of the United States in terms of that of a private individual under the law of the state where the alleged tort occurred." Guttridge v. United States, 927 F.2d 730, 732 (2d Cir. 1991); see also 28 U.S.C. § 2674.

Therefore, in order to prevail on his FTCA claim, Plaintiff must establish the same essential elements of medical malpractice that he was required to prove against the Epstein Defendants: "(1) that the defendant breached the standard of care in the community, and (2) that the breach proximately caused the plaintiff's injuries." Vale v. United States, 673 F. App'x 114, 116 (2d Cir. 2016) (summary order) (quoting Arkin v. Gittleson, 32 F.3d 658, 664 (2d Cir. 1994)). "In order to show that the defendant has not exercised ordinary and reasonable care, the plaintiff ordinarily must show what the accepted standards of practice were and that the defendant deviated from those standards or failed to apply whatever superior knowledge he had for the plaintiff's benefit." Sitts v. United States, 811 F.2d 736, 739 (2d Cir. 1987); see also Mayes v. United States, No. 15-cv-7155 (KPF), 2018 WL 1274029, at *13 (S.D.N.Y. Mar. 5, 2018) (same). "Such deviation is a proximate cause of the plaintiff's injury if it 'is a substantial factor in producing the injury.'" Mayes, 2018 WL 1274029 at *13 (quoting Mortensen v. Mem'l Hosp., 105 A.D.2d 151, 158 (1st Dep't 1984)). "[P]roof of a mere possibility of cure does not satisfy a prerequisite to liability, i.e., that [the doctor]'s malpractice was a legal cause—a substantial factor—in bringing about plaintiff's injury[.]" Mortensen, 105 A.D.2d at 158.

### b.  Expert Testimony

"Expert testimony is normally required to establish the applicable standard of practice and, in an appropriate case, to determine whether an alleged deviation from that standard was the proximate cause of a plaintiff's injuries." Berk v. St. Vincent's Hosp. & Med. Ctr., 380 F. Supp. 2d 334, 343 (S.D.N.Y. 2005); see also I.M. v. United States, 362 F. Supp. 3d 161, 190 (S.D.N.Y. 2019) (same).  "It is well established in New York law that 'unless the alleged act of malpractice falls within the competence of a lay jury to evaluate, it is incumbent upon the plaintiff to present expert testimony in support of the allegations to establish a prima facie case of malpractice.'" Sitts, 811 F.2d at 739 (quoting Keane v. Sloan-Kettering Inst. for Cancer Research, 96 A.D.2d 505, 506 (2d Dep't 1983)); see also I.M., 362 F. Supp. 3d at 190-91 (collecting cases).

At the summary judgment stage, "it is appropriate for district courts to decide questions regarding the admissibility of evidence." Raskin v. Wyatt Co., 125 F.3d 55, 66 (2d Cir. 1997); see also I.M., 362 F. Supp. 3d at 191 (same).  "This is true even if the exclusion of expert testimony would be outcome-determinative." Berk, 380 F. Supp. 2d at 351; see also Venetsky v. United States, No. 16-cv-8464 (DF), 2019 WL 1768967, at *16 (S.D.N.Y. Mar. 31, 2019) (holding the plaintiff could not establish a medical malpractice claim without admissible expert

testimony); <u>Foley v. United States</u>, 294 F. Supp. 3d 83, 96

(W.D.N.Y. 2018) (same); <u>Vale v. United States</u>, No. 10-cv-4270

(PKC), 2015 WL 5773729, at *4 (E.D.N.Y. Sept. 30, 2015) (same),

<u>aff'd</u>, 673 F. App'x 114 (2d Cir. 2016).

Federal Rule of Evidence 702 governs the admissibility of

expert testimony and provides:

> A witness who is qualified as an expert by knowledge,
> skill, experience, training, or education may testify in
> the form of an opinion or otherwise if: (a) the expert's
> scientific, technical, or other specialized knowledge
> will help the trier of fact to understand the evidence
> or to determine a fact in issue; (b) the testimony is
> based on sufficient facts or data; (c) the testimony is
> the product of reliable principles and methods; and (d)
> the expert has reliably applied the principles and
> methods to the facts of the case.

Fed. R. Evid. 702. "[T]he proponent of expert testimony has the

burden of establishing by a preponderance of the evidence that

the admissibility requirements of Rule 702 are satisfied[.]"

<u>United States v. Williams</u>, 506 F.3d 151, 160 (2d Cir. 2007); <u>LVL

XII Brands, Inc. v. Louis Vuitton Malletier S.A.</u>, 209 F. Supp.

3d 612, 635 (S.D.N.Y. 2016) (same).

"Although it is the role of the jury to determine the

credibility of an expert witness, it is the role of the trial

court to serve as a 'gatekeeper' to ensure that the expert

testimony is reliable and relevant before it is presented to the

jury." <u>I.M.</u>, 362 F. Supp. 3d at 191 (citing <u>Kumho Tire Co. v.

Carmichael</u>, 526 U.S. 137, 147 (1999) (finding that the trial

judge's gatekeeping obligation applies to all expert testimony);
Daubert v. Merrell Dow Pharm., Inc., 509 U.S. 579, 597 (1993)
(holding that the district court must ensure that an expert
witness' testimony "both rests on a reliable foundation and is
relevant to the task at hand")).  "An expert's opinions that are
without factual basis and are based on speculation or conjecture
are . . . inappropriate material for consideration on a motion
for summary judgment." Major League Baseball Props., Inc. v.
Salvino, Inc., 542 F.3d 290, 311 (2d Cir. 2008).  "The decision
to admit expert testimony is left to the broad discretion of the
trial judge and will be overturned only when manifestly
erroneous." Zerega Ave. Realty Corp. v. Hornbeck Offshore
Transp., LLC, 571 F.3d 206, 213 (2d Cir. 2009).

### c.  Bench Trial

Because the Epstein Defendants have been dismissed from
this action, Plaintiff's remaining claims, which are solely
against the United States, are subject to a bench trial in
accordance with 28 U.S.C. § 2402.  "Where, as here, the expert
will testify at a bench trial, courts are more willing to admit
expert testimony, with the understanding that the testimony can
be given only the weight that it deserves, or excluded in whole
or in part, after the trial as necessary." Utica Mut. Ins. Co.
v. Munich Reinsurance Am., Inc., No. 12-cv-196 (BKS), 2018 WL
3135847, at *4 (N.D.N.Y. June 27, 2018).  "It is not that

evidence may be less reliable during a bench trial; it is that the court's gatekeeping role is necessarily different.  Where the gatekeeper and the factfinder are one and the same—that is, the judge—the need to make such decisions prior to hearing the testimony is lessened." Id. (quoting In re Salem, 465 F.3d 767, 777 (7th Cir. 2006)); see also Victoria's Secret Stores Brand Mgmt., Inc. v. Sexy Hair Concepts, LLC, No. 07-cv-5804 (GEL), 2009 WL 959775, at *6 n.3 (S.D.N.Y. Apr. 8, 2009) ("[W]here a bench trial is in prospect, resolving Daubert questions at a pretrial stage is generally less efficient than simply hearing the evidence[.]").

Here, although the Court's gatekeeping function may be "lessened" under the circumstances of this case, Rule 702 still requires that the proffered testimony be reliable. See Fed. R. Civ. P. 702(c), (d).  Accordingly, even if the Court were to employ a more permissive standard which some courts have opted to apply to expert testimony in the context of a bench trial, any expert opinion that the parties will rely upon to prove or defend their case must be the product of reliable principles and methods that the qualified expert has reliably applied.

### 2. Breach

Plaintiff has offered Dr. Ackerman's expert testimony, in part, to prove that Dr. Pittman breached the applicable standard of care by failing to perform a urinalysis and CBC in December

2013, and by failing to investigate certain "clues" in 2014, such as Plaintiff's weight loss, elevated LDH, and anemia.[26]  The Government has offered expert testimony to the contrary, but it has not established—or argued—that Dr. Ackerman's opinion regarding breach is improper or inadmissible.

Accordingly, genuine disputes exist with respect to the parties' conflicting expert opinions which can only be resolved by a factfinder. See, e.g., Tarqui v. United States, No. 14-cv-3523 (KMK), 2017 WL 4326542, at *9 (S.D.N.Y. Sept. 27, 2017) ("Summary judgment is not appropriate in a medical malpractice action where the parties adduce conflicting medical expert opinions." (quoting DiGeronimo v. Fuchs, 101 A.D.3d 933, 936 (2d Dep't 2012))).

### 3.  Causation

Plaintiff has also offered the expert testimony of Dr. Ackerman to establish that Dr. Pittman's alleged negligence allowed Plaintiff's kidney cancer to grow untreated for approximately one year.  Plaintiff has offered Dr. Davies's

---

[26] Dr. Ackerman's report also states that Dr. Pittman failed to perform a prostate exam.  (Ackerman Report at 1.)  However, because neither Plaintiff's 56.1 statement, his memorandum of law in opposition to the Government's summary judgment motion, nor Dr. Ackerman's deposition testimony address this claim, the Court deems it abandoned. See Anti-Monopoly, Inc. v. Hasbro, Inc., 958 F. Supp. 895, 907 n.11 (S.D.N.Y. 1997) ("[U]nder New York state law, the failure to provide argument on a point at issue constitutes abandonment of the issue."), aff'd, 130 F.3d 1101 (2d Cir. 1997).

expert testimony to establish that Plaintiff's kidney cancer could have been present in 2014, when Dr. Ackerman opines that it should have been discovered, and that this delay in diagnosis allowed the cancer to cause substantial harm to Plaintiff's overall health.  The Government argues that summary judgment in its favor is appropriate because Dr. Ackerman's opinion is inadmissible to help establish the causation element of Plaintiff's medical malpractice claim; the Government offers conflicting expert opinions with regards to Dr. Davies's conclusions, which can only be resolved by a factfinder. See id. Accordingly, the Court now turns to the dispositive question of whether Dr. Ackerman's testimony must be rejected under Federal Rule of Evidence 702, and the related question of whether Plaintiff has failed to establish a prima facie claim of medical malpractice.

Dr. Ackerman's opinion on causation is twofold:  First, Dr. Ackerman concludes that Dr. Pittman's failure to perform a urinalysis and a CBC in December 2013 "caused a significant delay in diagnosis" for Plaintiff.  (Ackerman Report at 2.) Second, Dr. Ackerman opines that "[m]any clues leading to the diagnosis of renal cell carcinoma were missed during the early part of 2014 including, weight loss[,] elevated LDH[,] and

anemia."[27] (Id. at 1.) Essentially, Dr. Ackerman opined that, had Dr. Pittman ordered a urinalysis during the December 2013 physical, or had she investigated Plaintiff's abnormal blood work in 2014, Plaintiff's kidney cancer would have been discovered and treated in June 2014, approximately one year before it was eventually diagnosed.

"The issue of whether a doctor's negligence is more likely than not a proximate cause of a plaintiff's injury is usually for the jury to decide." Tarqui, 2017 WL 4326542 at *7 (alteration omitted) (quoting Polanco v. Reed, 105 A.D.3d 438, 439 (1st Dep't 2013)); see also Carrasco v. Sunwoo, No. 16-cv-530 (JCM), 2018 WL 3979598, at *9 (S.D.N.Y. Aug. 20, 2018) (same). Indeed, "no expert [can] definitively conclude what would have happened under an alternative set of facts. In this sense, all opinions with regard to proximate cause are speculative." Tarqui, 2017 WL 4326542 at *10 (emphasis omitted); see also Carrasco, 2018 WL 3979598 at *7 (same).

Here, the fundamental question is whether Dr. Ackerman's

---

[27] Dr. Ackerman also testified that Dr. Pittman failed to investigate Plaintiff's swollen lymph glands. (Ackerman Dep. Tr. at 45:19–46:2.) Plaintiff, however, has not offered any argument on this point. Further, Dr. Ackerman later testified that Dr. Epstein followed-up on Plaintiff's swollen lymph nodes by referring him to a specialist. (Id. at 46:20–47:5.) Accordingly, the Court deems this alleged breach to be abandoned for the same reasons as Dr. Ackerman's assertion regarding a prostate exam. See supra note 26; Anti-Monopoly, 958 F. Supp. at 907 n.11.

opinion is sufficiently reliable such that it is evidence upon
which a factfinder may find in favor of Plaintiff.  This is a
close question, but the Court finds that it is.

### a.  "Qualified as an Expert"

Rule 702 requires that an expert witness be qualified "by
knowledge, skill, experience, training, or education."  "Courts
in the Second Circuit liberally construe the expert
qualifications requirement, and generally will not exclude
expert testimony provided 'the expert has educational and
experiential qualifications in a general field closely related
to the subject matter in question.'" I.M., 362 F. Supp. 3d at
192 (quoting In re Zyprexa Prods. Liab. Litig., 489 F. Supp. 2d
230, 282 (E.D.N.Y. 2007)).  "An expert 'need not be a specialist
in the exact area of medicine implicated by the plaintiff's
injury, [but] he must have relevant experience and
qualifications such that whatever opinion he will ultimately
express would not be speculative.'" Id. (quoting Loyd v. United
States, No. 08-cv-9016 (KNF), 2011 WL 1327043, at *5 (S.D.N.Y.
Mar. 31, 2011)).

Here, Dr. Ackerman is board-certified in internal medicine
with approximately 30 years of experience in the field.  Looking
at the totality of his background, the Court concludes that Dr.
Ackerman has the educational credentials, experience, and
training to reliably opine on whether Dr. Pittman departed from

46

good and accepted medical practice.

Dr. Ackerman's qualifications, however, do not automatically render reliable his opinion with respect to whether a delay in Plaintiff's cancer diagnosis was caused by Dr. Pittman because Plaintiff has not established that Dr. Ackerman is also an expert in the relevant fields that relate to such a diagnosis: namely, oncology (cancer), nephrology (the kidneys), or urology (the urinary-tract system). See Nimely v. City of New York, 414 F.3d 381, 399 n.13 (2d Cir. 2005) ("[B]ecause a witness qualifies as an expert with respect to certain matters or areas of knowledge, it by no means follows that he or she is qualified to express expert opinions as to other fields."); see also Simpson v. Edghill, 169 A.D.3d 737, 738–39 (2d Dep't 2019) (ruling the trial court should have granted summary judgment in favor of the defendant physician where "[t]he plaintiff's expert failed to articulate that he had any training" in the relevant area of medicine, and "[t]he affidavit, therefore, lacked probative value and failed to raise a triable issue of fact as to whether any departure from the accepted standard of care proximately caused the plaintiff's injuries"); Foley, 294 F. Supp. 3d at 92 (ruling the plaintiff's proposed expert, a board-certified doctor in emergency medicine, could not testify as an expert on clostridium difficile, an infection, because the plaintiff offered no explanation

regarding how the doctor's expertise in emergency medicine qualified him to opine on such an infection).

Nevertheless, the Court finds that Dr. Ackerman is qualified to opine on causation in this case because, as discussed below, the Court finds that a genuine dispute exists regarding whether the urinalysis that Dr. Pittman failed to perform in December 2013, would have revealed blood in Plaintiff's urine. Accordingly, Dr. Ackerman's conclusion that a positive urinalysis in 2013, would have led to tests of Plaintiff's kidneys, which could have identified his cancer, is admissible because this sequence of steps is within Dr. Ackerman's area of expertise as an internist. Further, the Government may cross-examine Dr. Ackerman "about the gaps in his credentials and argue that the [factfinder] should not give much or any weight to [his] testimony. But it is not for the Court at this stage to assess Dr. [Ackerman]'s credibility or to decide how much weight his testimony should be given." I.M., 362 F. Supp. 3d at 193 (citing Jeffreys v. City of New York, 426 F.3d 549, 551 (2d Cir. 2005) (reiterating "the general rule that district courts may not weigh evidence or assess the credibility of witnesses at the summary judgment stage")).

### b.  "Based on Sufficient Facts or Data"

Rule 702(b) requires that an expert's testimony is "based on sufficient facts or data." In determining whether an

expert's opinion is admissible, "the district court should undertake a rigorous examination of the facts on which the expert relies, the method by which the expert draws an opinion from those facts, and how the expert applies the facts and methods to the case at hand." Amorgianos v. Nat'l R.R. Passenger Corp., 303 F.3d 256, 267 (2d Cir. 2002). "[N]othing in either Daubert or the Federal Rules of Evidence requires a district court to admit opinion evidence which is connected to existing data only by the ipse dixit of the expert. A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered." Nimely, 414 F.3d at 396 (quoting Gen. Elec. Co. v. Joiner, 522 U.S. 136, 146 (1997)) (alteration in original). "A minor flaw in an expert's reasoning or a slight modification of an otherwise reliable method will not render an expert's opinion per se inadmissible. 'The judge should only exclude the evidence if the flaw is large enough that the expert lacks "good grounds" for his or her conclusions.'" Amorgianos, 303 F.3d at 267 (quoting In re Paoli R.R. Yard PCB Litig., 35 F.3d 717, 742 (3d Cir. 1994)).

Here, although Dr. Ackerman's deposition testimony undermines the reliability of his opinion with respect to whether the "clues" that Dr. Pittman should have investigated would have led to an earlier identification of Plaintiff's

kidney cancer,[28] Dr. Ackerman's opinion that a urinalysis in December 2013 could have tested positive for blood is sufficiently reliable because he also testified that blood in a patient's urine can be intermittent. (Ackerman Dep. Tr. at 86:8-22.) The Government counters that Dr. Ackerman's conclusion is impermissibly speculative because Plaintiff underwent urinalyses at various times both before and after Dr. Pittman failed to perform the test, none of which tested positive for blood. The Government's argument, however, goes to the credibility and weight that should be afforded Dr. Ackerman's conclusion, rather than its admissibility, because if blood in a patient's urine can be intermittent, it is certainly possible that blood was present in Plaintiff's urine in 2013 and 2014, but not in his urine during the other times when he was tested and the results were negative.[29] Accordingly, Plaintiff

---

[28] Dr. Ackerman testified that anemia and elevated LDH are not markers for renal cell carcinoma. (Ackerman Dep. Tr. at 37:16-18, 38:3-8, 92:7-16). Further, the very tests that Dr. Ackerman opined were necessary to investigate Plaintiff's anemia and elevated LDH, such as tests for iron deficiency and a colonoscopy, were later ordered by Dr. Charney—but they are not the tests that diagnosed Plaintiff's cancer, which was found by accident, during a sonogram that was ordered in response to (1) a new complaint by Plaintiff to Dr. Charney that he had lost 20 pounds, (2) Plaintiff's abnormal liver results, and (3) Dr. Olsen's palpation of Plaintiff's liver, for the first time, during a physical examination. Finally, Dr. Ackerman acknowledged Plaintiff's weight loss was not clinically significant. (Id. 28:9-29:14.)

[29] The Government also takes issue with Dr. Ackerman's incorrect assertion that Plaintiff never underwent a urinalysis "during his entire tenure with the group." (Ackerman Report at 1.) This error certainly points to a flaw with Dr. Ackerman's analysis of Plaintiff's

has established a genuine dispute of material fact that must be resolved by a factfinder: namely, whether the urinalysis that Dr. Pittman failed to perform would have tested positive for blood in the urine, and whether such a test result would have led to an examination of Plaintiff's kidneys and the timely diagnosis of his cancer.

### c. "The Product of Reliable Principles and Methods" "Reliably Applied"

The Government next argues that Dr. Ackerman's conclusions are not the result of a rigorous, reliable, and testable procedure as required by Rules 702(c) and (d). "An expert opinion requires some explanation as to how the expert came to his conclusion and what methodologies or evidence substantiate that conclusion." Riegel v. Medtronic, Inc., 451 F.3d 104, 127 (2d Cir. 2006), aff'd, 552 U.S. 312 (2008). Here, Dr. Ackerman's report does not refer to any journals or articles in support of his conclusions, and he does not explain how he arrived at his opinion. Therefore, the Government argues, there is "simply too great an analytical gap between the data and the opinion proffered." Gen. Elec., 522 U.S. at 146; see also Romano

medical records, and it may be evidence upon which a factfinder may doubt Dr. Ackerman's conclusions, but it does not impact the reliability of his opinion that a urinalysis may have provided an early warning of Plaintiff's kidney cancer because the error does not impact any step in that analysis. Cf. Amorgianos, 303 F.3d at 267 (quoting In re Paoli, 35 F.3d at 746) ("The judge should only exclude the evidence if the flaw is large enough that the expert lacks 'good grounds' for his or her conclusions.").

v. Stanley, 684 N.E.2d 19, 23 (N.Y. 1997) ("[P]laintiffs' expert's affidavit was devoid of any reference to a foundational scientific basis for its conclusions."); Feuer v. Ng, 136 A.D.3d 704, 707 (2d Dep't 2016) (holding the plaintiff's expert report failed to raise a triable issue of fact regarding causation where "[t]he affidavit was conclusory and speculative on the issue of proximate cause").  "[C]onstruing all the evidence in the light most favorable to [Plaintiff] and drawing all reasonable inferences in [his] favor," Anemone v. Metro. Transp. Auth., 629 F.3d 97, 113 (2d Cir. 2011), the Court disagrees.

Here, Dr. Ackerman's report draws a logical connection between Dr. Pittman's alleged breach—i.e., her failure to order a urinalysis during Plaintiff's December 2013 physical—and Dr. Pittman's failure to identify an early indicator of kidney cancer—i.e., blood in the urine—which she allegedly did not know about because she did not order the urinalysis. See Ackerman Report at 1 ("Dr. Pittman did a physical examination on 12/31/13 in which some testing was done but absent from the examination was a urinalysis . . . .  As a result, no hematuria was ever picked up during routine examination which would have been an early indicator of [r]enal [c]ell [c]arcinoma.").  Dr. Ackerman provided additional testimony in support of this conclusion during his deposition. See Ackerman Dep. Tr. at 26:11–22 and 31:3–7 (explaining that blood in the urine can be a sign or

symptom of kidney cancer), 85:11–86:3 (explaining blood in the
urine would lead to "a workup, which would potentially diagnose
renal cell carcinoma").

Whether a factfinder chooses to assign any weight to Dr.
Ackerman's opinion is a question for trial.  The opinion itself,
however, is not an impermissible "mere possibility," Mortensen,
105 A.D.2d at 158, but rather, raises a genuine dispute of
material fact that is the result of a logical and evidence-based
process: namely, because blood in a patient's urine can be
intermittent, blood may have been observable in Plaintiff's
urine at a time when his kidney cancer could have been
diagnosed.  If blood was observed, an investigation into its
presence may have revealed an issue with his kidneys, which
could have led to an earlier diagnosis of the kidney cancer
(only if, however, the factfinder also determines that
Plaintiff's kidney cancer was present and diagnosable at that
time—a separate, genuinely disputed question of material fact).

"It is not for the Court at this stage to decide which
version of events and which explanation of [Plaintiff]'s
injuries is more plausible." I.M., 362 F. Supp. 3d at 194
(citing Bale v. Nastasi, 982 F. Supp. 2d 250, 258–59 (S.D.N.Y.
2013) ("Where each side . . . tells a story that is at least
plausible and would allow a jury to find in its favor, it is for
the jury to make the credibility determinations and apportion

liability, and not for the court."); <u>Scott v. Coughlin</u>, 344 F.3d 282, 290-91 (2d Cir. 2003) ("The credibility of [the plaintiff]'s statements and the weight of contradictory evidence may only be evaluated by a finder of fact.")); <u>see also</u> <u>Amorgianos</u>, 303 F.3d at 266 (noting that an expert is not required to back her opinion with published studies that specifically support the opinion, but "lack of textual support may 'go to the weight, not the admissibility' of the expert's testimony"); <u>Tarqui</u>, 2017 WL 4326542 at *10 ("In this sense, all opinions with regard to proximate cause are speculative.").

Accordingly, because Plaintiff has proffered admissible expert testimony that Dr. Pittman may have departed from good and accepted medical practice, and that at least one such departure may have proximately caused a delay in Plaintiff's kidney cancer diagnosis, which allowed the cancer to exacerbate Plaintiff's ultimate injury, genuine disputes of material fact remain which must be resolved by a bench trial.

## III. Conclusion

For the foregoing reasons, the Epstein Defendants' motion for summary judgment is GRANTED; the Government's motion for summary judgment is DENIED. As set forth in more detail in the Court's Pre-Trial Requirements, which will be filed simultaneous to this Opinion & Order, Plaintiff and the Government must be prepared for trial before the Court beginning on April 27, 2020.

The Clerk of Court is directed to terminate the motions docketed at ECF Nos. 51 and 56, and schedule the first day of trial for April 27, 2020.

**SO ORDERED.**

Dated:  New York, New York
        January 2 3, 2020

John F. Keenan
United States District Judge